Good morning, Your Honors, and may it please the Court, my name is Margaret Farrin. I'm from the Federal Public Defender's Office, appearing today on behalf of the defendant, Alcohol and Michael Avenatti. I'd like to reserve three minutes for rebuttal, and I'll be sure to watch my time. This Court should vacate Michael Avenatti's 168-month prison sentence and remand for resentencing due to the individual and combined effect of numerous errors. Unless the Court would prefer otherwise, I would like to focus on two of those errors today. First, the loss calculation under Guideline 2B.1.1, and second, the obstruction of justice enhancement under Guideline 3C.1.1. First, regarding the loss calculation, whether the District Court accurately calculated the loss in this case comes down to a simple question. Is it true that, but for Michael Avenatti's fraud, his four clients would have obtained $12.35 million more than they actually did? The answer is no. They did not contract to receive $12.35 million from their settlements. The actual amount that they would have received without the fraud would have been less than $9.5 million, so as to decrease the offense level, and possibly below $3.5 million if we account for M Cosmetics, because that is the amount of their settlements that they contracted to obtain. The government does not dispute the taking account of the fees and costs alone, without any further adjustment for payments for health care or other things. Simply the fees and costs alone would bring the loss amount below $9.5 million, so as to decrease the offense level at least two levels. And then the clients, in addition, received additional sums of money from Avenatti that further decreased the loss. The District Court committed legal error in calculating the loss here because it did not perform the analysis that 2B1.1 requires. 2B1.1's analysis is purely quantitative. It attempts to measure the loss or the harm to victims, that's all. Defined as the difference between what the victims were left with after the fraud and what they would have had, had the fraud not occurred. And that analysis proceeds in two steps. This court so held in Morris, that's cited in the briefing, it says these two steps are compelled by the text of Guideline 2B1.1. First, the court has to assess what is the actual loss? The reasonably foreseeable pecuniary harm resulting from the offense, and that is a but-for causation standard. Had the fraud not occurred, what would the defendants have had? And so in that first step alone, it is untenable to include fees and costs that the clients contracted not to receive. But in determining the amount of the loss, when you look at the commentary to the guideline, it says that the loss should be reduced by the fair market value of the services rendered, not by the contract amount of the services rendered. So doesn't the court have to look at the fair market value? It does, Your Honor, and that's at step two. So I want to make sure we're not conflating two steps. So step one is but-for. But-for the fraud was the reasonable foreseeable pecuniary harm. And you can't include things that the clients wouldn't have obtained without but-for the fraud. So this brings us down to fees and costs that they wouldn't have obtained. Then at step two, to the extent that there were any valuable services rendered, the district court didn't decide whether that was true, but that's the step at which you value whether there were any services provided. Did Mr. Avenatti provide any valuable services to these clients? That only comes in at step two after you've already seen what would they have received had he not committed the fraud. They would have gotten the value of their settlements without those fees and costs. Then at step two, we can value his services. I think the government kind of conflates those two things and says, oh, it was enough to just do a valuation analysis, but that's not what Guideline 2B1.1 requires. At step one, you first look at the reasonably foreseeable pecuniary harm. That brings you down below the $9.5 million at least. And then you have to do a valuation of the services. How do we do that, though? Okay, and I think here's another point at which we differ from the government. The government is saying that it's permissible at that point to turn to California law, equitable fee recovery law, Rodriguez v. Dissner Restatement 37, which talks about forfeiture, which doesn't actually require harm, doesn't really require any diminution in value. The Rodriguez v. Dissner case explicitly said these class members didn't suffer any harm. And yet when you're looking at the fair market value of the fees, why isn't it reasonable to ask, like, would these fees be recoverable? And if the forfeiture theory gets you to these fees would not be recoverable, the fair market value becomes zero. Why isn't that a proper way to look at it? I think what this part is saying is that there has to be a two-step process. First, you see what was the reasonable foreseeable pecuniary harm. What would they have received had no fraud occurred? Imagine a world where there was no fraud. Harper and Berger also talk about this. But, okay, I mean, let's say you're right about that. Dividing it into the steps, you still get to the second step, and if the second step, the fair market value is zero, you're still not going to get those fees, right? Just to be clear here, nobody here is trying to get fees. We're just simply trying to do no harm to clients, okay? So it might be possible to take into account that these services were worthless, that's step two. But we've already come down, just so your honors are clear, we can't include fees and costs that would never have been recovered if no fraud had occurred. That's step one. You can't talk about the value of the services with the fraud, because that's not what step one under Morris is about. I'm not understanding why, when we're trying to figure out what the amount that should be calculated is, why does it matter whether we do that calculation in step one or step two? It matters, Jana, because I think what the government is saying is that if you do a valuation at step one, you don't have to consider what the clients would have gotten in a but-for situation. You assume there was fraud. Under the government's analysis at step one, they consider a world where fraud has occurred. I understand that you disagree with that, and maybe you're right, but if we're going to still then take out the fee amount at step two, why does it matter if we made that mistake at step one? You're not taking out the fee amount at step two, your honor. You're looking at what was the fair market value of the services that were rendered. Because you're persuaded that the answer to that is zero. Okay, so say you're persuaded the answer to that is zero. Then at step one, what would the clients have obtained without the fraud? They would have gotten a loss amount below 9.5. And then at step two, you wouldn't offset anything. You'd say the fair market value of the services that were provided to them was zero. I see why you're saying that matters. In step two, though, we're clear. So the only question here is how much farther do we go? We know we have to go down two levels. And that in itself is a difference in the offense level. But there was a significant amount of value here I'd like to talk about for a second, which is M Cosmetics. The district court found that M Cosmetics was unrelated work. It didn't find that McLavinati wasn't hired to perform that, or that he was compensated for it, or that he wasn't entitled to be compensated for it. He said, you know what, the district court didn't take issue with that. It just said you have to go seek that in a separate case because it's unrelated work. That was a clear error, Your Honors, because that was not unrelated work. The district court kind of lumped in the value of M Cosmetics with other types of work that McLavinati asked to be remoderated for, such as other litigation for Mr. Borrella, reviewing Alexis Gardner's music industry contracts, other things that really were outside of this case and not within their contracts. M Cosmetics was not that way. M Cosmetics was different. That was clearly within the scope of the contract between Michelle Phan and McLavinati. The recovery was defined to include not just the cash, but the value of any business interests. There was an overall terms agreement that was sent out by MC that talked about the asset recovery and the buyback of stocks. So they're going to buy back some of her stocks. Some additional shares of stocks will be canceled, and then she'll get M Cosmetics. She'll get some trademarks. This was all one, and it happened contemporaneously. Around the end of 2017 and early 2018 is when all of this took place. And these were related. I want to direct your honors. I'm sorry. It was a tautological mistake by the district court to say, because M Cosmetics was not a part of these services that was fraudulent, I'm not going to consider it. That's legal error. In cases that have talked about government contracts where a person, let's say, is not qualified to get a government contract that they could sign off, and they get the contract to do a number of different kinds of work, such as the supply case, and it's a circuit. Somebody was not a qualified therapist but got a contract to provide counseling services for IRS employees. He provided lots of services to lots of people. That was the scope of the contractual work that was involved in the fraudulent scheme, and it was all of those services that were taken into account in computing loss, and the ones that were actually validly rendered, because he did hire some licensed therapists to provide some of those services, they had to be offset. Same thing here with M. I'm not going to tell you, Your Honors, what the value of M is because we don't know. So how could the court then factor that in and determine the amount of attorney's fees? It's not the amount of attorney's fees, Your Honor. It's the fair market value. What I'm saying is if there isn't any evidence of what that was worth, which you just said you're not going to provide us with, how could that amount be determined for the court to figure out the amount of the loss? Through an evidentiary hearing, Your Honor, which Michael Avenatti requested, the court said that the burden was on him. In other words, the court said, no, I won't let you present evidence on this value of M because we already had a trial on wire fraud. There are three problems. I was going to ask you whether you're conceiving that the issues with respect to the fair market value and the court's analysis with respect to grafting this sort of forfeiture analysis for the other cases that are not the M cosmetics case. Are you conceiving that grafting this sort of forfeiture analysis makes sense for the fair market value determination? No, Your Honor. I don't think that the forfeiture analysis is valid to calculate fair market value at all because the receiving 37 factors are not all based on value and actually don't have a lot to do. So you're sort of focusing on M cosmetics? I'm focusing on M cosmetics, but that's all of them. I don't think it was valid for the court. It wouldn't have been valid for the court to use these factors like the willfulness, threat or actual harm, adequacy of other remedies. These are not valuation factors, and so that wouldn't be proper. Can I ask you, I don't want to tell you how to spend your time, but I am interested in hearing from you about the obstruction of justice enhancements. Can you address that? Certainly, Your Honor. So I think there's sort of a threshold issue here, is that the government is saying that Castro-Ponce doesn't plainly apply here. They're going under the plain error standard. So I think question one is are we under plain error or are we not? Because if we're not under plain error and if Mr. Avenatti's objection was adequate, they're not, to my reading, contesting that Castro-Ponce's standard applies. For the reasons in the briefs, his objection was more than adequate. He objected at ER 61 generally to each enhancement. He specifically also objected to the adequacy of the findings later on in the hearing, and he was pro se, so to the extent you have any doubt about the adequacy, it should resolve it in his favor. But I also want to address Rojas Millon, which is the case that the government cites for this idea that you have to object separately to each. Okay, Rojas Millon is, well, first of all, Rojas Millon itself. What does he do with the fact that Rojas Millon might be contrary to what the Supreme Court said in Dunnegan? I mean, we have a case that came out after Dunnegan that seems to sort of suggest a different standard than what the Supreme Court has told us. So in Dunnegan, the court said when the defendant objects to the enhancement, these independent findings must be made. And I will just say that right after Dunnegan, even before Castro-Ponce, in Luca, this court began applying that outside the context of defendant testimony at their own criminal trial. From the beginning. From Luca, Rojas Millon itself, that was a co-defendant's trial. Taylor, that was a bond hearing. It's always applied the independent finding standard and required that outside the context. So I think the court is trying to impose a limitation that this court has never imposed. But going back to Rojas Millon, what Dunnegan said was if the person objects to the enhancement itself, the court must make independent findings. In Rojas Millon, the person did not object at all. The defendant didn't object to that enhancement until after the court had already ruled on it. The court already ruled on the obstruction of justice enhancement, and it was only then during a colloquy that the government initiated that the person said, I'll just also say that this isn't material. So obviously that's not an adequate objection under Dunnegan because it wasn't even made until obstruction was ruled on. So the court simply can't take that as being any kind of indication of what objection is required. And the other thing about that is I think the government also says Rojas Millon for the idea that it's okay to adopt findings in a presentence report. That's not an accurate characterization. In Rojas Millon, the court did do that. It said, I adopt the findings in the PSR. Can I just ask, because you're running out of time. Sorry. I know that you want more findings on all the elements. But if you win on any one of the elements, like say we agree with you that there needed to be a finding on willfully obstructing justice with respect to this offense, is that essentially enough because you'll get a remand to have this? Or is it going to make a big difference whether it's a remand on all of the elements or just one of the elements? I think any one of them is sufficient to get a remand. There needed to be findings on all of them. And quite honestly, do we need an instruction that says that specifically? I think what Judge Friedland is asking is does it matter how we articulate a ruling on remand with respect to whether findings need to be made for all the elements or just the willfulness one. I think Your Honor should say that there needs to be a finding made on all of them because that's what Castroponce requires and that's what Dunegan requires. This court was so far away from making any kind of finding that it wouldn't even comply with Dunegan, frankly. I mean, there's nothing that resembles any kind of a finding. We don't even know which of the various proceedings that were referenced in passing by the government the court considered, if any. We don't know that there was any consideration given to that. So I think any one of them is enough for a remand, but I think the court should instruct the court on remand to make the findings required by Dunegan and Castroponce. So if you were not successful on your net loss argument, but you were successful on the obstruction of justice argument, the two-level reduction for obstruction of justice, wouldn't the advisory guideline range still be within the area that the court sentenced your client at? No, Your Honor. The district court applied the obstruction of justice enhancement, and so therefore if that enhancement were vacated, the offense level would go down by two levels. But your client was sentenced below the advisory guideline range. In that sentence, even if there was a two-level reduction, isn't it within the new advisory guideline range? I think under Rosales-Morales, Your Honor, we have to have an adequate and correct guideline calculation to start with. Even if the ultimate sentence that was imposed was within the guideline range that we're seeking, there needs to be a correctly calculated starting point under the guidelines. I don't think it would be a harmless error. No, Your Honor, I don't. And honestly, I really don't think it would be a harmless error, especially when that district court explicitly keyed its variance, its downward variance, to the bottom end of the guidelines range that it applied. I'm sorry, I'm blanking on the exact range, but 234 to 268, I think, was the guideline range it applied. But in any event, it said I am varying downward four levels. So it was clear about that. So if the guideline range were lower, it would presumably – there's reason to think, at least, that it would do the same and his ultimate sentence would be lower by some amount. Thank you. We've taken you over your time. Thank you, Your Honor. But I'll give you two minutes for rebuttal. Thank you, Your Honor. Good morning, and may it please the Court, Ronnie Katzenstein for the United States. I'll start right away with the obstruction issue. The only matter that the defendant objected to in the district court was willfulness. That was all he objected to. He specifically said, I didn't know about any impending or actual investigation. Therefore, I could not have obstructed anything. There was no willfulness here. And we know that that's the only thing he was objecting to because he cited the DeGeorge case, which this court has been overruled by the guidelines, and he did not cite Donegan or Castro-Ponce at any point. So we are, I would submit, specifically in a plain error arena here for that. Well, but as to willfulness, it's not a plain error. As to willfulness, the court made a distinct and explicit finding that his objection was overruled, and that's at 1 E.R. 1516, adopting the government's showing at 1 T.S.R. 8992 with the specific judgment debtor exams that the government is relying on for the obstruction enhancement. He specifically cited the guideline commentary overruling DeGeorge and said your basis for saying you can't have been willful does not apply. It doesn't matter. You have to have known that there is the potential for an investigation, and he certainly did know that. He was aware that both Barella and Gardner had contacted law enforcement. So the court specifically addressed his particular objection and made a finding on that particular objection. And I would submit to you, had he not been so specific in his objection, if he had sort of more broadly objected, then would you agree that our court's cases and Donegan would have required express findings with respect to both the elements of the enhancement as well as the perjury elements? Well, first I would say that under Grissom, we do require defendants to present the grounds for their objection. Why is it not enough for him to object to the fact that he provided a more specific objection? Why wouldn't that require the court to make express findings as our case level retires on all of the elements? I would say that if there were ever a case in which respect for the plain error doctrine applied, it would be this one, because this defendant objected to virtually every paragraph of the PSR, every proceeding that the district court used in sentencing, and in a sort of broad-brush way, he generally objected to all of the enhancements. The court, the district court, made valiant efforts to address every single objection. It allowed the defendant to have multiple rounds of briefing. It even delayed the sentencing for additional briefing. It addressed each and every one of his objections. And to say a general, generic objection when the district court specifically did address the one thing he raised. So I'm confused, though, because on the one hand you're saying he only objected to this very specific and that's all that potentially there is at grounds in your argument that the district court didn't even express finding. But on the other hand, you're saying it would not be okay to make a broad objection either. So is it what you're arguing is that he needed to object to every single element of the enhancement as well as the perjury? I think he should. If he had said, I'm objecting that you're not complying with the standard of Castro-Ponce, the court would have made those specific findings. He didn't do that. He simply said there isn't willfulness and that is all he presented to the court. And I would also say because I believe we are in the plain error realm, he can't make out plain error for a variety of reasons. First of all, the testimony at issue, the perjurious testimony at issue, happened outside the context of his own testimony in his own trial. Therefore, it did not raise the very issues that underlie the rationale of requiring specific findings. There was no possibility of chilling his right to testify in his own trial. And whether we agree or disagree that that should apply in other contexts, there's no law in this circuit applying it in other contexts. All the cases arise in the trial context, the defendant's own testimony or the theory. This is a theory that you're urging to try to reconcile where Rojas Milan departs from our other precedent. But, I mean, there is a different way of looking at this, which is that Rojas Milan is just an outlier. And, really, the standard is set by Dunnegan. Well, in Dunnegan, Dunnegan was simply looking at whether or not the enhancement was constitutional to begin with. And Dunnegan carved out a space to say it is constitutional because a defendant may testify truthfully and may testify untruthfully. The enhancement only applies for perjurious testimony at his trial. And, therefore, that is why they asked for specific findings. But no case in this district has said, sure, you have to find, the court has to find that the factual predicates of perjury are there. But express findings, on the record, explicit findings of Incastro-Ponce, that's when the perjury enhancement is based on the defendant's own testimony in his own trial, bringing to the fore the concern about chilling a defendant's right to testify in his own defense. But Incastro-Ponce doesn't limit its holding to that. You're just tying together the facts of that case to sort of explain the potential distinction, correct? Well, I would suggest that the holding is limited by the facts of the case. I mean, the case arose in a trial context. We know in Herrera-Rivera this court said that express findings are required when applying the enhancement based on the defendant's testimony at trial. That is the background. The holdings are understood against the background of the facts in which those holdings arise. And I would suggest at a minimum, perhaps this court doesn't agree with that, but at a minimum there was no case law precisely on point, and, therefore, it can't be plain error, even if it were to err, it can't be plain error under Gonzales-Aparicio because there was no law specifically on that point. There was no dispute here about falsity. There was no dispute about materiality. Sending it back, and this would be Judge Schreier's question, I'm not sure that the court could go through the exercise of stating its findings, which were clear to everybody. Those would have been the findings. The court wasn't given that opportunity because the defendant didn't make this objection below. I would suggest to you that on plain error review it's not appropriate to send this back. So if we find that express findings were necessary, do you agree that there were not express findings made by the district court? I believe there were express findings on willfulness, which was the only item that the defendant challenged, and I believe that that was sufficient. It is correct that he did not specifically address falsity, although the district court did say the showing of the government is sufficient, and the government's showing, which was cited specifically, did establish the falsity and the materiality, and I believe, given that we're in the context not of his trial testimony, that that is sufficient. I don't believe there was error, but if the court finds that there is error, I don't believe it was plain error warranting sending it back to the district court. Even as to willfulness, I know you pointed to ER 15 to 16, and I'm looking at it, and I think there's a legal analysis there, but can you point me to what sentence you think is the express fact finding about willfulness? Well, I think when he says, I'm going to apply the enhancement, and he has rejected the sole objection that has been made, he is clearly rejecting there. That may be implicit, but that's not very express. And again, I'm not sure that express find, I mean, he's making the findings that he needs to make. I don't believe that there's any case law that says in this context they need to be explicit or magic words. We have some case law where the findings have been upheld, but, you know, not even though there aren't the magic words of going through each of the specific factual components of perjury. If I could turn to loss for a minute. The court here did find that the full amount of the settlements was the amount of loss, and Judge Friedland, I was interested in your question regarding does it matter which way we got there, because that came up during the sentencing hearing. The defendant did acknowledge that the ultimate issue was the amount of loss he was being held responsible for. However, you got there, and at 1 ER 63 during the sentencing, the court said, well, the question is whether the record supports the evidentiary basis for the finding, not who produced it. In other words, who produced the evidence, which way you came at it. And the defendant said, I don't necessarily disagree with that. And throughout the discussion, the whole discussion by the defendant with respect to loss was put in the context of offsets. He wasn't saying it isn't appropriate up front. And I will say, if you look, for example, when he asked for an evidentiary hearing at 1 ER 60, he said it was to produce evidence relating to what I believe are valid amounts that should be deducted from the loss amount in order to arrive at an accurate loss amount. At 3 PSR 493, he objected to the PSR's finding that the 12.35 million was the loss by saying, it provides defendant with no credit for fees, costs, and expenses, which must be included in the loss announce and deducted. And the court itself understood that all of defendant's arguments were being made in the context of credits or offsets. And that's what the court said at 1 ER 12. I'm following, because this is kind of complicated, the step one and step two. So it sounds like you're agreeing it actually does matter if it's in step one or step two, but you're saying he forfeited the idea that it had to be in step one. He certainly agreed that all of his arguments were about offsets and credits. That's correct. And that is how the court understood his arguments and how the court responded to those arguments. Isn't that also how the guidelines are set up? Because there's a whole section under 2B1.1e about credits against loss. Yes. Why would that section exist if it was done at step one? Because then there wouldn't be credits against loss. I agree with you entirely, Judge Schreier. And I would also say that even if we're just in step one, the analysis isn't what harm, what position the defendants, the victims were in but for the crime. The analysis is what is the reasonably foreseeable harm to defendant that he is inflicting on the victims. And he is stealing their proceeds. He is lying to them continuously. He is causing them great financial and emotional damage. No one, no lawyer could reasonably believe that he was nonetheless entitled to his fees. So if you think you're in step one or step two, I suggest the way the district court said, we're in the same place. So you aren't agreeing that it matters. You're saying it would get to the same result either way, not just a forfeiture argument. Because now it sounds like you are saying maybe this should be a step one inquiry. I think the reasonably foreseeable, I think we'd get there either way. Yes, Your Honor. With the reasonably foreseeable harm that he is inflicting on his clients, which is what we look at to determine the original loss figure. And Judge Schreier points out that that is how the guidelines are set up. That reasonably foreseeable harm that he is causing, what's reasonably foreseeable to him, not to the victims, but to him, is the total amount he's stealing from them. That's correct, Your Honor. And again, I just want to address for a moment defense counsel's argument that the court erred by applying California law. That's not what happened here. The court said, I looked at the, I considered the factors that are identified in the restatement. The court wasn't making a per se rule that I'm going to apply California law or the restatement. The factors were good factors for a person making a factual argument, a factual analysis, which is what Judge Selma was doing here. Those factors, the gravity and timing of the violation, the willfulness of the violation, the effect that the lawyer's conduct had on the client, and any actual harm, all cut in favor of the judge's determination that no one, the fair market value of these so-called services was absolutely zero. No one would pay to have their money stolen from them, to be deprived of the opportunity to buy. The other way of looking at that, but for his services, they wouldn't have been entitled to the settlement amounts. I would suggest, Your Honor, that what he was doing was those services were designed to get the settlements into his hands. They wouldn't have been entitled to the settlements. They didn't get the settlements. His services got the settlements for him. But what Your Honor, I think, is asking, and I do believe it is distinct restitution versus sentencing laws, and that's why we did respect the fact that from the point of view of the victims, when you look at it from the point of view of the victims, which is not what you look at it for sentencing laws, from their point of view, yes, they were going to get the settlement minus the fees, which is why for restitution, we said you're not entitled to more. So on restitution, I'm having trouble understanding why he shouldn't get the fees for the M cosmetics value. So here's why. There was no question at trial that he had gotten all of the fees he was entitled to for his work for FAN. That is what FAN testified to. That is what TRAN testified to. Her testimony, unrebutted, was take the full amount of your fee out of the first chunk of the payment. I guess I don't understand that because I thought that the 7.5 percent, the amount he got at first came from, like, the monetary amount, and the value of the company isn't accounted for. Is that not right? That is not correct, Your Honor. He got the 7.5 from the total of the first payment and then the second payment for 8 million, which came to a total of something like 32 million, and he was getting his 7.5 percent of that. It had nothing to do with the fee price. He never said to TRAN or FAN, I'm entitled to more. There was no testimony of that. He never asked for that. It was separate. But are you saying that when you do the math of how you get to the amount, you need to take into account the value of the company to get to that calculation? No. To get to the calculation of the amount he took as his fees, it is the amount of the buyback of two checks. It has nothing to do with the value of M Cosmetics. That was completely separate. And so why doesn't he get 7.5 percent of the value of M Cosmetics as part of the restitution calculation? Because that was not part of the fee that he was entitled to. It was separate work. It wasn't the value of the fees that he was receiving was the 7.5 percent of the two checks that came. M Cosmetics had nothing to do with it. It was a completely separate thing. The court certainly did not clearly err in finding that it was separate work, given the testimony that was there, and there was no evidence of the actual value of M Cosmetics. He suggests that it was based on, you know, he had two newspaper articles and his training and his experience. That's utterly speculative. Essentially, he came up with a number that was a plug to wipe out the amount that he owed to Pham. And so he denied an evidentiary hearing on that issue? He wasn't denied an evidentiary hearing. He didn't, well, first of all, he's not really, he's not entitled to an evidentiary hearing on that, and his presentation to ask for an evidentiary hearing was woefully lacking. He had ample opportunity to cross-examine the witnesses at trial to present evidence at trial. He had many, many rounds of briefing. This was not a surprise issue. Multiple rounds of briefing requesting that he be given credit for this. In his motion for an evidentiary trial, for an evidentiary hearing, he also presented a lot of evidence. The court merely has to give him an opportunity to be heard and to make his arguments, which it did. He identified nothing that he would have put on at an evidentiary trial to establish the value of M Cosmetics. We have you over your time. I'm over. Thank you. I would respectfully request that the court affirm the sentence. Thank you. Thank you. Thank you, Your Honor. Just a few points. First, this idea that Michael Abilardi didn't object as a pro se defendant. He objected generally at ER-60 and ER-61 to each and every enhancement generally. He then objected specifically to the lack of findings. The government has conceded that if he pointed out the inadequacy of the findings, that would be sufficient to preserve the error. He did precisely that. He said that there has been no finding that this conduct at issue, specifically perjury, was designed to obstruct justice. As a pro se defendant, specifically objecting to the inadequacy of findings, to me it's unbelievable that anyone could ever conclude that that was inadequate. When neither Dunnigan nor Castro Ponce requires objection to the findings as opposed to simply the enhancement, he objected every way he could. There was nothing else that anyone, let alone a pro se defendant, could have done to preserve this error, and Michael Abilardi repeatedly preserved it. The idea that no case, I think the government said no case of this court, has applied the specific independent findings outside the context of one's own criminal trial is just simply false, Your Honors. In LUCA, which was right after Dunnigan, it was a false prospectus submitted to a state administrative agency, and this court adopted the ruling of the Second Circuit in Zagari about an administrative proceeding that then became an environmental prosecution. Quite honestly, Your Honors, the idea that the rationale for Castro Ponce and Dunnigan is simply limited to testimony at one's own trial is not true either. In many of these cases, it's part and parcel. There's an administrative proceeding that's going to lead to a criminal proceeding, and it's very clear. We want people to provide information in these proceedings. We want people to provide prospectuses to state administrative bodies, and to say that there's no need to even find that it was willful or material, would show that testimony just as surely as in one's own trial, and that's why this court has repeatedly applied it in bail hearings. In the government's own case, Rojas Millon, a co-defendant's trial, and then in SEC proceedings, depositions, this idea that there's some limitation to the criminal trial itself is simply not accurate. I would like to go on to the idea that the court made a finding on willfulness. That is also simply not true, Your Honors. If you look at the ER page of the government's sites, ER 15, the only mention of willfulness is in connection with the Alexis Gardner tweet, which is not being pursued here and is not a basis for obstruction. It says, The court is unable to conclude by a preponderance of the evidence that Avenatti willfully obstructed or impeded or attempted to obstruct a defeat. That's only for Gardner, and that is not an issue here. Once it goes down to the only basis for the obstruction enhancement that was actually considered by the court, the judgment debtor exams and all of this, there are no findings at all on willfulness or anything else, Your Honors. And all of that would be required. The idea also, then I'm just moving on to the last issue, that the court did not apply a forfeiture or apply state law. That also is untrue, Your Honors. The court said very clearly what it was doing here. It said, We have way over your time, so can you wrap up? I'm sorry. If you look at ER 12, it says, The Ninth Circuit has recognized the propriety of forfeiture such as the one ordered here. It said it was ordering a forfeiture. It said it did so under Restatement Section 37, which is state law, which includes things unrelated to loss or quantity. Rodriguez v. Dissner says you don't need any loss at all or any harm at all. That is pure legal error. And if Your Honors even think that Step 1 and Step 2 could simply come out the same, that doesn't matter because the court's analysis is so flawed, Your Honors. Just simply send it back so the court can make that determination in the first instance on Step 1 and Step 2 because its state law analysis was legally wrong, Your Honors. And I ask you to vacate Mr. Avenatti's sentence and remand for resentencing. Thank you. Thank you both sides for the helpful arguments. This case is submitted.
judges: FRIEDLAND, DESAI, Schreier